IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| OPAL LABS INC., an Oregon corporation,<br><br>Plaintiff,<br><br>v.<br><br>SPRINKLR, INC., a Delaware corporation,<br><br>Defendant. | Case No. 3:18-01192-HZ<br><br>SPECIAL MASTER ORDERS REGARDING DISCOVERY DISPUTES<br><br>*RULE 53(f)(2) NOTICE* |

*Counsel:* Chad M. Colton, Adam M. Starr, and Daniel J. DiCicco appeared for Plaintiff.
Christopher J. Pallanch, Michael C. Willes, and Megan K. Houlihan appeared for Defendant.
B. Scott Whipple appeared for Interested Party Herman.

SPECIAL MASTER HENRY KANTOR:

The below findings and orders regard the parties' pending discovery disputes as first set out in "Opal's Brief On: (1) Inspection of Sprinklr's Repositories; (2) Production of Sprinklr's JIRA records and; (3) Production of Sprinklr's Confluence Notes" (ECF 109), which will be referred to as the plaintiff's motion to compel; and "Defendant Sprinklr's Motion to

Compel" (ECF 111), which will be referred to as the defendant's motion to compel. Over time, the parties' discovery requests changed in certain ways. For the reasons which follow, both motions to compel are granted in part and denied in part. All production is subject to the terms of the existing Protective Order (ECF 108).

BACKGROUND

Following my appointment as Special Master by the Court (ECF 98) and under the authority of Fed. R. Civ. P. 53(c)(1), I asked counsel to send me letters describing their discovery disputes. I then met with counsel to discuss the disputes and to establish a procedure and schedule to resolve the disputes. I directed counsel to send each other letters focusing on their most immediate discovery needs with specifics as to exactly what was needed and then to confer, with the hope that some of the disputes could be resolved without my involvement. Although no dispute was resolved, the process clarified the focal points of dispute. The parties then submitted their motions to compel and responses to those motions.

On February 7, 2020, I held an evidentiary hearing so that the parties could present expert testimony on the technological issues and oral argument on how to resolve the disputes. At the conclusion, I announced my rulings regarding the defendant's simpler motion to compel. In light of the party's presentations, I invited the plaintiff to submit a letter by February 14, further limiting the requests set out in its more complex motion to compel. Transcript of February 7, 2020 Hearing (Tr.) at 256. The plaintiff's counsel submitted a letter. That should have ended the submissions — but it did not, as will be explained below. Instead, it appears that this matter was truly submitted for decision only by late February at the earliest. Any later delay in issuing this decision is a result of my personal issues and, of course, the impact of the coronavirus.

As complex as this trade secret case already is or may become, the matters before me do not involve challenging legal issues or standards, at least in part because it appears that the particular issues have not generated published opinions which control or provide much guidance. On the other hand, the technology at issue is sophisticated and beyond the ken of the average judge, so all descriptions of technology in this decision will be simplified to the basics. Both sides fairly acknowledge that the other is entitled to reasonable discovery of the facts which would help them try to prove their claims and defenses. The disputes I resolve now are on how best, fairly, efficiently, and economically to provide the reasonable discovery.

LEGAL STANDARDS

The parties agree on the governing standards so I set out only the controlling general rule:

> Scope in General. Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable.

Fed. R. Civ. P. 26(b)(1).

In this case, it is agreed that the important criteria are relevancy, proportionality, importance, and burden. The factors involving amount in controversy (tens if not hundreds of millions of dollars) and resources (substantial) do not assist resolution. The relative access to the needed information is not in dispute — each party wants what only the other party has. Further discussion of the governing legal standards is not essential to these orders.

CLAIMS AND DEFENSES

In its Second Amended Complaint (ECF 61), the plaintiff asserts eleven claims for relief based in fraud, breach of the Teaming Agreement, breach of the covenant of good faith and fair dealing in the Teaming Agreement, breach of the Non-Disclosure Agreement, breach of the covenant of good faith and fair dealing in the Non-Disclosure Agreement, breach of the Terms of Use Agreement, breach of the covenant of good faith and fair dealing in the Terms of Use Agreement, declaratory relief, injunction, violation of the Uniform Trade Secrets Act, and tortious interference with economic relations. For the purposes of the pending discovery disputes, all of these claims directly derive from or are closely related to the allegations that the defendant improperly accessed the plaintiff's confidential and proprietary software technology in April 2014 and used that technology to create new software to its advantage and to the plaintiff's disadvantage, which allegations I will take as true for now. *See Opal Labs, Inc. v. Sprinklr, Inc.*, 2019 WL 6528589 at 1 and 3 (D. Or. 2019).

In its Answer, Affirmative Defenses, and Counterclaims to the Second Amended Complaint (ECF 65), the defendant denies the essential allegations and asserts eighteen affirmative defenses based in the statute of limitations as to the alleged trade secret, the statute of limitations as to fraud, release, laches, waiver, estoppel, waiver of jury trial, limitation on damages, due process, claim or issue preclusion, standing, joinder, real party in interest, unclean hands, unconscionability, failure to define or describe trade secret, acquiescence, and the statute of limitations generally. The defendant also asserts three counterclaims seeking a declaratory judgment and attorney fees.

In its Answer and Affirmative Defenses (ECF 68) to the defendant's counterclaims, the plaintiff denies the essential allegations and asserts three affirmative defenses based in failure to state a claim, unclean hands, and intentional wrongdoing. The affirmative defenses and counterclaims are not pertinent to the discovery disputes on which I have not yet ruled.

PLAINTIFF'S MOTION TO COMPEL

1. Introduction and Sequence of Events

After exchanging letters and conferring, the plaintiff moved to compel production of three categories of documents: Git repositories, JIRA tickets, and Confluence notes (explained below). The plaintiff claimed these documents were necessary because the defendant believed that it no longer had its pre-April 2014 software in an active format so that the plaintiff would have "to pierce together the makeup of Sprinklr's pre-April 2014 software through secondary evidence of what it looked like and what features it had." ECF 109 at 1. Thus, it was the defendant's belief that it could not produce the pre-April 2014 software which prompted the discovery request for documents which would reveal the underlying source code for the software. The defendant responded by pointing out that the plaintiff's requests improperly had expanded the universe beyond what had been contemplated and conferred and by proposing a more limited production with extensive screening to be done by the defendant. ECF 115 at 2-5.

The plaintiff needs to learn what Sprinklr's platform looked like before the allegedly improper access. It seeks to compare the prior platform's functions to the later functions to attempt to determine whether any of Opal's proprietary technology is contained in the later functions. Everyone agrees that the actual older platform and its source code would be the best evidence. As everyone believed that the older platform was no longer available, there has been

an ongoing battle over what information the plaintiff was entitled to discover to try to prove its case.

There is no question that the plaintiff has presented a moving target in its requests. Each time it has described what it wanted, starting before I was appointed as Special Master, during the early process designed to focus the issues, through the actual motion to compel, and after the hearing, it has modified its requests and described them in different terms. The defendant was reasonably frustrated. Up until the hearing, I similarly was frustrated but planned to make the necessary rulings to move the case forward without spending unnecessary time trying to determine why the request had changed.

During the hearing, it became clear to me that there was *some* good reason for the changing requests. The plaintiff's expert opined that it was unlikely that all prior source code log information had been deleted during the transition from SVN to Git. Testimony of Professor Ronald Schnell, Tr. at 121-22. That testimony persuaded me that there are sufficient grounds to challenge the defendant's original premise that it could not produce the pre-April 2014 software — a fresh look was and is warranted. While the plaintiff *should* have learned and understood more about how it would go about proving the improper access well before the hearing, it also is true that by November 2019 the defendant *should* have learned by and understood more about why it believed it could not produce the software or its reasonable facsimile. It turns out that neither side really was up to speed in what has become at best a learning experience for all.

As mentioned earlier, I had directed the plaintiff to narrow its requests to the extent possible by February 14. The letter submitted purported to do that, although it did ask for some

items not previously specifically requested. I began my analysis, waiting for receipt of the hearing transcript which arrived on February 21 to confirm certain testimony and arguments. Then, things changed.

2. The Reveal and Aftermath

On February 24, the defendant submitted a letter asserting that, based at least in part on Professor Schnell's testimony about how it could be done, the defendant had been able to locate source code which essentially would support a re-creation of some version of the pre-April 2014 software, and suggesting that this might alter the parties' positions significantly as to the need to produce what has been described as secondary evidence. On February 25, the plaintiff submitted a letter asserting that the defendant's plan to recreate a version of the pre-April 2014 software was dubious and unreliable, and then conditionally asked for yet a different set of documents than described in its motion or in its February 14 letter. In response on February 27, the defendant submitted a letter explaining in more detail what would have to be done to recreate its software and, again, pointing out that the plaintiff had changed and arguably expanded its discovery requests.

On March 5, the defendant submitted a detailed plan and schedule protocol for the restoration work and sent for review a link to a screen recording of a sample of the current state of the work (essentially showing that there were many problems which would be difficult to fix). Since then, there have been multiple oral and email reports on progress. A preliminary demonstration (which counsel and I attended virtually) occurred on April 9.

While many unknowns remain, it is clear that the defendant has expended much time, resources, and money on its effort to recreate its software, and has done so in good faith even if

ultimately unsuccessful. It is tempting to simply wait and see what will happen next, because it is conceivable that the product of the defendant's work will in fact provide a useful version of the subject software or its underlying source code which might reduce the need for some of the requested documents.

However, for both sides the discovery process in this case has become an incessantly moving and changing target. Delays have been the only constant. The principal reason Chief Judge Hernández appointed a special master was to move this case forward so that a merits disposition would become possible in the relatively near future. So, while I will take into consideration both the newest developments and the difficulties caused by the changing requests and unique circumstances such as the coronavirus pandemic, and declare that portions of this decision had to be rewritten several times, I nonetheless will rule on the plaintiff's specific requests.

As a result of the proceedings to date, I believe that the February 14, February 24, February 27, and March 5 letters described above have become a necessary part of the record of this case. Therefore, I direct that counsel cooperate to file a single declaration attaching these letters (without the linked screen recording and any duplicate exhibits), under seal to the extent necessary. If counsel agree that additional letters are required, they may include them as well.

3. <u>Git Repositories</u>

A. *Generally*

Software companies like Sprinklr manage the source code underlying their software with source code version control systems. These control systems allow developers and project managers to track and log all updates and changes to the source code, including the date a change

was made, who made the change, and the reason for the change. Schnell Testimony, Tr. at 85. The source code is placed in multiple storage repositories, including those for different projects.

In November 2015, more than a year after the first allegedly improper access to Opal's software, Sprinklr switched from a source code control system called SVN to what is known as the Git system. (It appears that "Git" is not a typical tech-based acronym and why it is called "Git" is not important to this decision.) In so doing, Sprinklr believed that it deleted its prior SVN source code logs. The plaintiff asserts that this deletion may rise to the level of spoliation while the defendant explains it was just part of doing business without regard to what was an ongoing (but different) dispute between the parties at the time. For the purposes of deciding the plaintiff's motion to compel, it does not matter which side is right — that is for another day. And, at any rate, there appears to remain a chance that at least parts of the SVN system might be recreated.

In its written and oral arguments, the defendant asserted that various types of secondary evidence would provide adequate information to enable the plaintiff to make a determination of whether any of it proprietary information was utilized by the defendant after the alleged improper access. Those arguments were not remotely persuasive in light of Professor Schnell's testimony, so I will move on to the specific requests propounded by the plaintiff.

B. *Plaintiff's Requests for Git Repository Information*

In its motion to compel, the plaintiff proposed discovery of the defendant's Git repositories in four steps (summarized from ECF 109 at 4-5):

(1) Sprinklr will provide an export list of its Git repository titles and descriptions to Opal, on an attorneys' eyes only basis. If a title or description of a Git repository is insufficient for Opal to understand what is housed there, Sprinklr will provide a further explanation of the substance of that Git repository.

(2) Opal's expert will select a reasonable number of repositories from the list for inspection. If Sprinklr objects to the number or substance of Opal's selections, the Special Master will rule on the issue.

(3) The inspection will take place at a reasonable location of Sprinklr's choosing. One Opal attorney and expert may be present. Sprinklr will provide Opal's expert with a computer containing certain programs requested by the expert. Each of the selected repositories will be accessible from the computer. Sprinklr will provide a printer and labeled paper for printing. Opal's expert will be able to print up to 500 pages of information from the repositories but will not print more than 25 consecutive pages of contiguous source code. The printed pages will be produced to both parties. The inspection shall be up to 28 hours spread over four days. If more pages or time is needed, the parties will confer and seek intervention by the Special Master if needed.

(4) The printed repository information shall be designated attorneys' eyes only. Opal's attorneys shall maintain all paper copies and a record of anyone who has inspected any of the information. Electronic copies would be limited to necessary litigation papers.

After the hearing, in its February 14 letter, plaintiff modified its request in certain ways. Most significantly, instead of steps (1) and (2), Sprinklr is to provide Opal's expert with access to inspect Git repositories which (a) contain a reference to the Nike UCP, Content Marketing, Core, Media Planner, or Space projects, and/or (b) contain "code that implements features or functions associated with content marketing and planning." Sprinklr also is to certify that it has conducted a manual review of each of these repositories. Plaintiff added that its expert and attorney would be entitled to take notes "if those notes are not detailed enough to allow someone reading the notes to create all or part of any software associated with the source code and provided that those notes are treated as [Attorneys' Eyes Only] and not shared with clients." In its February 25

letter, the plaintiff asserted that it might be possible to limit this request if Sprinklr is successful in restoring its software but, meanwhile, continued its February 14 request.

C. *Ruling*

While the plaintiff's request for Git repository information has moved, expanded, and changed over time, I conclude that its February 14 proposal is in fact a narrowing which under the circumstances of this case is reasonable. I accept the defendant's concern that this might result in production of thousands of unnecessary records. Still, the specified projects represent, for the first time, a field of discovery which will (1) result in less production and less expense and (2) likely not require extensive litigation to determine compliance.

The plaintiff has now removed itself from the screening process in return for a certification that the defendant has done as required. That is a significant improvement over a plaintiff-based screening process and will adequately protect the defendant's proprietary information. The defendant shall perform the screening.

The processes laid out in the February 14 letter make sense to me with the limited technological training provided during the hearing. If for any reason these processes present unforeseen difficulties, I see no reason why the parties' experts cannot resolve them more sensibly than lawyers and judges. Still, if even that does not work, I will step in as necessary.

Given that the number of records to be produced is significantly less than those which would have been generated by the broader request, I limit the inspection period to 18 hours over three days. I remember Professor Schnell's expressed desire for more than four days as well as his confidence that he could do the job in less time.

For these reasons, I grant the plaintiff's motion to compel the Git repositories as modified by the February 14 letter and the reduced inspection time, and otherwise deny the motion.

4. JIRA Records

A. *Generally*

While Git systems help manage source code, JIRA is a tool to plan and sequence software development tasks. JIRA tickets are used to describe a new feature or correct a problem. Often, JIRA tickets include communications between people working on the project and demonstrative attachments. The JIRA ticket number regularly is referenced in the Git log. People working on the project can trace changes back to JIRA tickets and see the detail accompanying the change. ECF 109 at 6.

B. *Plaintiff's Requests for JIRA Records*

In its motion to compel, the plaintiff proposed discovery of the defendant's JIRA records in four steps (summarized from ECF 109 at 9-10):

(1) Sprinklr to provide an explanation of each project specified on a previously-provided list.

(2) Opal's expert to select a reasonable number of projects from the list for inspection. If Sprinklr objects to the number or substance of Opal's selections, the Special Master will rule.

(3) For the projections not requested to be produced in their entirety for inspection, Sprinklr shall run specified supplemental search terms and produce all responsive JIRA tickets.

(4) Sprinklr to produce missing comments and attachments from previously-produced JIRA tickets, missing JIRA tickets referenced in previously-produced Git log snippets, and the "JIRA-linked Release Notes" that pertain to changes in its content marketing software.

After the hearing, in its February 14 letter, the plaintiff modified its request in certain ways. Most significantly, instead of steps (1) and (2), Sprinklr is to produce in their entirety the JIRA tickets for the Nike UCP, Content Marketing, Core, Media Planner, and Space projects. In lieu of step (4), Sprinklr is to produce "the missing comments and attachments from the JIRA tickets already produced *** [and] the JIRA tickets references in the JIRA-linked release notes and git log snippets."

C. *Ruling*

First, I accept Professor Schnell's view that he will need to see the JIRA records regardless of the Git production. Again, I view the February 14 letter as narrowing the scope of this discovery request. Again, it is appropriate that the defendant perform the necessary screening. Therefore, I grant the plaintiff's motion to compel the JIRA records as modified by the February 14 letter, and otherwise deny the motion.

5. <u>Confluence Notes</u>

A. *Generally*

JIRA and Confluence systems are sold by the same software company and are designed to be used together. Confluence contains notes taken during meetings of developers and project managers. These notes often cross-reference to JIRA tickets. Sprinklr's Confluence records are organized into Spaces (which the untrained might consider as folders) corresponding to JIRA projects. ECF 109 at 14.

B. *Plaintiff's Requests for Confluence Notes.*

In its motion to compel, the plaintiff proposed discovery of the defendant's Confluence notes in three steps (summarized from ECF 109 at 14-15):

(1) Sprinklr to provide an explanation of what is in each Confluence Space.

(2) Opal's expert then will select a reasonable number of Confluence Spaces from the list for inspection. If Sprinklr objects to the number or substance of Opal's selections, the Special Master will rule.

(3) For the Spaces not requested by Opal to be produced in their entirety, Sprinklr shall run specified search terms and produce all responsive Confluence records.

After the hearing, in its February 14 letter, plaintiff modified its request in certain ways. Most significantly, instead of steps (1) and (2), Sprinklr is to produce in their entirety the Confluence Spaces for the Nike UCP, Content Marketing, Core, Media Planner, and Space projects. Plaintiff also modified its search terms for step (3).

C. *Ruling*

The parties generally agree that the ruling regarding the JIRA records essentially covers the Confluence notes. Therefore, for the same reasons I grant the plaintiff's motion to compel the Confluence notes as modified by the February 14 letter, and otherwise deny the motion.

6. <u>The Future</u>

The process which led to the narrowing of the plaintiff's requests for discovery was rigorous. Essentially, the plaintiff was encouraged to review and revise what it really needed and to find new ways to obtain it which increased the chance that I would actually allow it. This process will not go backwards. This means that there now is a presumption that the discovery to be produced by the defendant as a result of these orders is sufficient for the plaintiff to take depositions and prepare for trial. Of course, circumstances could change. But it will the plaintiff's burden to demonstrate a need to revisit the scope of discovery sought before the narrowing process.

It is my intention that these rulings would survive almost any recreation of the pre-April 2015 platform. But I realize that it is impossible to be certain. Before either side takes the step of filing a motion with me (as compared to the separate right to request review by Chief Judge Hernández) to modify these rulings solely because of the recreation of the older platform, I will require counsel first to confer with each other and then also with me.

DEFENDANT'S MOTION TO COMPEL

After exchanging letters and conferring, the defendant moved to compel production of documents from former Sprinklr employees now at Opal and sales call reports which contain the word "Sprinklr," as well as a deadline for producing documents which were agreed to be produced. The plaintiff objected on the grounds that the discovery sought was not relevant to any claim or defense and was over-broad and further asserted that it had agreed to produce much of what was still being sought.

At the hearing, it became clear that the plaintiff had produced or agreed to produce all but a few categories of documents and would do so on a schedule acceptable to the defendant. Then, after a thoughtful exchange of arguments and with appropriate consideration of Rule 26(b)(1)'s criteria of relevancy, proportionality, importance, and burden, counsel came to a highly reasonable agreement. Tr. at 265-68. I promptly converted the agreement into an oral ruling now restated here: the defendant will receive production of all of the Sprinklr documents and sales calls reports requested *for the reasons stated in its motion and no other* and the plaintiff will apply those reasons by screening the documents for subject relevancy. Therefore, the defendant's motion to compel is granted in all respects except that which had become moot by

the hearing and that the plaintiff will perform the required screening, and so in small part is denied.

DATED: April 11, 2020.

Special Master Henry Kantor

**NOTICE TO PARTIES AND COUNSEL:** Pursuant to Fed. R. Civ. P. 53(f)(2), a party may file objections to, or move to adopt or modify, these orders no later than 21 days after a copy is served, unless the court sets a different time.