IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


OPAL LABS INC.,                                      No. 3:18-cv-01192-HZ

                    Plaintiff,        OPINION & ORDER

    v.

SPRINKLR, INC.,

                    Defendant.

Chad M. Colton
Adam M. Starr
Stanton R. Gallegos
Daniel J. DiCicco
Kathryn P. Roberts
MARKOWITZ HERBOLD PC
1455 SW Broadway, Suite 1900
Portland, OR 97101

    Attorneys for Plaintiff


1 – OPINION & ORDER

Robert L. Carey
Christopher J. Pallanch
Michael Willes
Sadie Concepcion
Paul M. Balmer
TONKON TORP LLP
888 SW Fifth Avenue, Suite 1600
Portland, OR 97204

      Attorneys for Defendant

HERNÁNDEZ, District Judge:

      This trade secrets dispute arises out of a failed collaboration between two software companies. Plaintiff Opal Labs Inc. alleges that Defendant Sprinklr, Inc., stole its trade secrets after the parties collaborated for a joint customer. Plaintiff brings claims for breach of contract, breach of the implied covenant of good faith and fair dealing, fraud, tortious interference with economic relations, and violation of the Oregon Uniform Trade Secrets Act.

      Both parties move for summary judgment on some of Plaintiff's claims and Defendant's affirmative defenses. At oral argument, the Court resolved part of the parties' motions and reserved ruling on Defendant's first, third and fourth motions, and Plaintiff's first and fifth motions. Hr'g Tr., ECF 289. For the reasons that follow, the now Court grants in part and denies in part the remaining motions.

## BACKGROUND

      Plaintiff and Defendant are software companies with complementary products geared toward the creation and publishing of marketing content. At the beginning of the parties' working relationship, Defendant's primary product enabled marketing teams to publish content across different "channels," including social media platforms like Facebook and Twitter. Plaintiff's product helps marketing teams plan and create marketing campaigns. Using both systems together, a marketing team could plan and create a marketing campaign with Plaintiff's

product and then publish that campaign on various platforms with Defendant's product. And that is exactly what was intended when the parties worked for Nike in 2013. Giannini Decl. ¶ 3, ECF 263.

Defendant and Plaintiff each had independent relationships with Nike that pre-existed the parties' collaboration. Herman Decl. ¶¶ 2–3, ECF 227. In mid-2013, Nike suggested to Plaintiff and Defendant that they explore "integration" of both of their platforms. Giannini Decl. ¶ 4. The parties subsequently executed a nondisclosure agreement to share information with each other. Pallanch Decl. Ex. 12, ECF 226; Giannini Decl. ¶ 5. As the parties began working together, Defendant showed its platform to Plaintiff, and Plaintiff granted some of Defendant's employees access to Plaintiff's software. Pallanch Decl. Exs. 13–14. Both parties also continued to provide services to Nike. Soon after, Defendant began to consider further development of its own content planning software. *See* Starr Decl. Ex. 3, ECF 265.

In early 2014, Nike asked Defendant to estimate the cost and time to build a "functional equivalent" of Plaintiff's platform. Pallanch Decl. Ex. 22 (email from Paul Herman asking "[w]hat would it take for Sprinklr to build the functional equivalent of what we have in Opal today and what we require in the near future?"). Along with its request, Nike sent Defendant a document identifying its requirements for content planning software. *Id.* Defendant and Nike— through Nike employee Paul Herman—ultimately planned to work on building a platform together. Starr Decl. Exs. 7, 8.

In April 2014, Herman provided a Sprinklr employee with access to Plaintiff's platform through Nike's Opal account, Starr Decl. Exs. 10, 11, 12, and a software developer for Defendant in India obtained access to Plaintiff's platform and the list of requirements for Nike's content planning software, *id.* at Exs. 11, 12.

When Plaintiff discovered that Defendant had access to Plaintiff's live environment, Plaintiff sent Defendant a cease-and-desist letter. Pallanch Decl. Ex. 36; Giannini Decl. ¶ 7. Two of Plaintiff's executives then had a telephone conference with three of Defendant's executives on May 1, 2014. Pallanch Decl. Ex. 37 (Giannini Dep.) 67:14–21; Giannini Decl. Ex. 1. During the call, Defendant's CEO—Ragy Thomas—claimed that there had been a misunderstanding and that the access had been for the purposes of the Nike integration. Giannini Decl. Ex. 1. He also stated that they were not interested in competing with Plaintiff and were only developing a platform with "baseline content planning capabilities." *Id.* at 55:25–56:7, 39:16–18. Ultimately, Thomas proposed that the parties form a partnership to pitch their complementary software to their clients. *Id.* at 40:20–22. This discussion led to the Teaming Agreement, which allowed the parties to introduce clients or customers to one another while restricting the use of confidential information shared between the parties to activities in furtherance of their relationship under the Teaming Agreement. Pallanch Decl. Ex. 41.

A few months later, Defendant began working on its Content Marketing module. Starr Decl. Ex. 51 (Michaud Dep.) 8:1–17, 14:18–25. Defendant released a prototype of this platform to some customers in early 2015. *Id.* at 10:11–12:7, 13:20–14:17. Nike also embarked on a project to build a Unified Communications Platform—also called Beacon—to bring its marketing and analytics under one umbrella.  Herman Decl. ¶ 4; Starr Decl. Ex. 47 (Herman Dep.) 39:11–12, 40:16–20, 41:3–42:8. In the fall of 2015, Defendant won a bid to program the "back end" of the Beacon platform. Herman Decl. ¶ 5; Starr Decl. Ex. 52 (Singh Dep.) 106:8–107:13. During this time, Herman and others from Sprinklr accessed Plaintiff's software. Second Gorman Decl. Exs. 3, 5, 6, ECF 264.

In early 2016, Nike changed course and determined that its platform would not be entirely unified, and it would use Opal for planning and Adobe for asset management. Pallanch Decl. Ex. 44; Herman Decl. ¶ 6. Beacon would focus only on targeting, scheduling, publishing, engagement, and measurement functions. *Id.* Throughout 2016, Nike used Adobe, Opal, and Beacon together. Herman Decl. ¶ 6. Meanwhile, Plaintiff and Defendant entered into an "Integration Agreement," which contemplated integration of their platforms for customers like Nike. Pallanch Decl. Ex. 47.

Ultimately, Nike and Defendant abandoned Beacon, and Defendant began developing Planner 2.0. Starr Decl. Ex. 55 (Shibahara Dep.) 5:16–52:7, 53:3–15; Starr Decl. Ex. 52 (Singh Dep.) 107:14–23. Defendant continued to access Plaintiff's software in March, May and June of 2016. Gorman Decl. Ex. 6 at 10–18. Defendant then began to sell Planner 2.0, which it dubbed a "full replacement" of Opal. Starr Decl. Exs. 31, 25, 36. Plaintiff heard that Defendant was "undermining Opal in the market." Giannini Decl. ¶ 11. Plaintiff's CEO—Steve Giannini— spoke with Thomas about the parties' relationship and was reassured that the sales team pitching Sprinklr "was probably just not up to speed" on their relationship. *Id.* Giannini spoke with Sprinklr's president, who echoed this sentiment. *Id.* But soon after this meeting, Nike—after working out a deal with Defendant—considered ending its relationship with Plaintiff to adopt Defendant's new planning tool. Starr Decl. Exs. 29, 38, 26; Pallanch Decl. Ex. 48.

Nike officially notified Plaintiff that it was terminating its contract with Plaintiff in May 2017. Pallanch Decl. Ex. 49. Nike and Plaintiff later agreed to extend their agreement to 2018. Pallanch Decl. Ex. 50. In March 2018, Nike sent Plaintiff another notice of termination, and Plaintiff's work for Nike ended in mid-2018. Pallanch Dec. Ex. 51. Nike ultimately replaced Plaintiff's platform with Defendant's Planner 2.0.

**STANDARDS**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. *Suever v. Connell*, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. *Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011). If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support its claim than would otherwise be necessary. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

///

///

**DISCUSSION**

Plaintiff and Defendant both move for partial summary judgment. Defendant moves on all of Plaintiff's claims except for its breach of contract claims. Def. Mot. Summ. J. ("Def. MSJ"), ECF 225. Defendant also argues that it is entitled to summary judgment on some of Plaintiff's theories of damages. *Id*. Plaintiff moves for summary judgment on six of Defendant's affirmative defenses, its reservation of rights to seek attorney's fees for a "bad faith" trade secrets claim, and on two discrete factual issues involving the Nike's role in the underlying dispute. Pl. Mot. Summ. J. ("Pl. MSJ"), ECF 221. At oral argument on July 2, 2021, the Court resolved most of the parties' motions. Now, the Court addresses the remaining parts of each parties' motion.

I.      **Defendant's Motion for Summary Judgment**

All that remains of Defendant's Motion for Summary Judgment are: (1) Defendant's first motion for summary judgment on Plaintiff's combination trade secrets claim; (2) Defendant's third motion for summary judgment on Plaintiff's claims for breach of the covenant of good faith and fair dealing; and (3) Defendant's fourth motion for summary judgment, arguing Plaintiff's claims for fraud and tortious interference with economic relations are preempted by the OUTSA.

A.      Plaintiff's OUTSA Claim

"To establish a claim under the [OUTSA], a plaintiff must demonstrate that: (1) the subject of the claim qualifies as a statutory trade secret; (2) the plaintiff employed reasonable measures to maintain the secrecy of its trade secrets; and (3) the conduct of the defendants constitutes statutory misappropriation." *Acrymed, Inc. v. Convatec*, 317 F.Supp.2d 1204, 1218 (D. Or. 2004) (citing *Western Medical Consultants, Inc. v. Johnson*, 835 F.Supp. 554, 557 (D. Or. 1993)). The statute defines "trade secret" as "information . . . that derives independent

economic value, actual or potential, from not being generally known to the public or to other

persons who can obtain economic value from its disclosure or use; and is the subject of efforts

that are reasonable under the circumstances to maintain its secrecy." Or. Rev. Stat § ("O.R.S.")

646.461(4). Misappropriation includes the improper acquisition, disclosure, and use of a trade

secret, including the "use of a trade secret of another without express or implied consent by a

person who, at the time of disclosure or use, knew or had reasons to know that the knowledge of

the trade secret was acquired under circumstances giving rise to a duty to maintain its secrecy or

limit its use." *Id.* at (2)(d).

   Defendant argues that the Court should pare back Plaintiff's OUTSA claim and dismiss

Plaintiff's combination trade secret. Def. MSJ 20. In making this argument, Defendant points to

part of Kent's report, which it contends demonstrates that Plaintiff does not have evidence that

either Defendant or Plaintiff uses certain elements of the combination. *Id.* at 20–21; *see also*

Pallanch Decl. Ex. 60 (Kent Dep.) 50:6–25 (testifying that he did not address Trade Secret 17

(Brainstorms) or Trade Secret 19 (Opal's Research/Testing Environment)). Plaintiff responds

that under the OUTSA use of each element of a combination trade secret is not required. Pl.

Resp. Def. MSJ 25, ECF 261. Rather, it is enough that Defendant acquired Plaintiff's trade

secrets and substantially derived its own platform from the misappropriated information. *Id.* at

25–27.

   The Court denies Defendant's motion for summary judgment on Plaintiff's combination

trade secret. Defendant offers little support for its legal contention that Plaintiff must

demonstrate that Defendant's product uses or incorporates of each of the elements of Plaintiff's

combination trade secret to succeed on this claim. *See* Def. MSJ 20–21. Indeed, as the cases cited

by Plaintiff demonstrate, "information may be improperly 'used' in that it is unlawfully acquired

and then built upon or modified before being disclosed or benefit derived." *SkinMedica, Inc. v. Histogen Inc.*, 869 F.Supp.2d 1176, 1197 (S.D. Cal. 2012) (citing *Speech Tech. Assocs. v. Adaptive Commc'n Sys.,* No. C-88-2392-VRW, 1994 WL 449032 at *10 (N.D. Cal. Aug. 16, 1994) and *American Can Co. v. Mansukhani,* 742 F.2d 314, 328–29 (7th Cir. 1984)); *see also BladeRoom Group Ltd. v. Facebook, Inc.*, Case No. 5:15-cv-01370-EJD, 2018 WL 452111, at *5 (N.D. Cal. Jan. 17, 2018) ("[P]roof that trade secrets have been 'used' can come in various forms, direct incorporation being just one possible form. Consequently, an actor is liable for using the trade secret with independently created improvements or modifications if the result is substantially derived from the trade secret." (internal citations and quotations omitted)). While "mere possession of a trade secret or mere internal discussion within the company of a trade secret" may not constitute "use" under the Act, there is a spectrum of activities outside of direct incorporation of a trade secret that may constitute use. *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F.Supp.2d 1064, 1072 (N.D. Cal. 2005) (finding use includes "internal experimentation with trade secret information" and [e]mploying the confidential information in manufacturing, production, research[, and] development."). Accordingly, the absence of Defendant's use of every element of Plaintiff's claimed trade secret "does not foreclose the possibility that [Defendant's] process was not substantially derived from the claimed trade secrets, even if it differed in specifics from the process described therein." *SkinMedica,* 869 F.Supp.2d at 1197.

Similarly, Defendant suggests that Plaintiff's combination trade secret fails because Plaintiff's claimed elements are not trade secrets. Def. MSJ 20–21 ("Opal must show that the elements and the alleged combination are, in fact, trade secrets."). This argument fails. "A trade secret [may be] comprised of partially or entirely non-secret elements and still merit protection."

*SkinMedica*, 869 F.Supp.2d at 1194 (citing *O2 Micro Int'l., Ltd. v. Monolithic Power Sys., Inc.*,

420 F.Supp.2d 1070, 1089–90 (N.D. Cal. 2006)).

Defendant appeared to largely abandon these arguments in its reply and at oral argument,

focusing instead on its argument that Plaintiff failed to describe its combination trade secret with

sufficient specificity. *See* Def. Reply MSJ 20, ECF 278; Hr'g Tr. 19:8–13. The Court reiterates

its prior holding that Plaintiff, at trial, will be limited to those secrets as it defined them in its

December 2019 response to Interrogatory 4. Order, ECF 99; *see also* Starr Decl. Exs. 60–61, 64

(Interrogatory Responses). The Court also observes that there may be potential evidentiary issues

with this secret because—as Defendant has pointed out—Plaintiff's expert Peter Kent does not

appear to address Plaintiff's combination trade secret as described in its interrogatory response.

Def. Reply MSJ 20 (citing Kent Report ¶¶ 180–81, 153, 339, ECF 254-1) (discussing the

absence any specific description of the combination trade secret by Plaintiff's expert). But this

argument was not developed adequately until Defendant's reply brief. *Compare* Def. MSJ 20–21

*with* Def. Reply MSJ 20. Accordingly, the Court declines to address it further. Defendant is

denied summary judgment on Plaintiff's combination trade secret.

      C.     Plaintiff's Claims for Breach of the Implied Covenant of Good Faith & Fair
            Dealing

Defendant argues that Plaintiff's claims for breach of the implied covenant of good faith

and fair dealing should be dismissed because they are duplicative of the breach of contract

claims. Def. MSJ. 25. Oregon courts recognize an implied contractual duty of good faith and fair

dealing. *See Best v. U.S. Nat'l Bank. of Or.*, 303 Or. 557, 561, 739 P.2d 554 (1987). The

contractual good faith doctrine is designed to "effectuate the reasonable contractual expectations

of the parties." *Id.* at 563; *see also Klamath Off-Project Water Users, Inc. v. Pacificorp*, 237 Or.

App. 434, 445, 240 P.3d 94 (2010) (the implied duty of good faith and fair dealing "serves to

effectuate the objectively reasonable expectations of the parties"). "[S]o long as it is not inconsistent with the express terms of the contract, the duty of good faith is a contractual term that is implied by law into *every* contract." *Eggiman v. Mid-Century Ins. Co.*, 134 Or. App. 381, 386, 895 P.2d 333 (1995) (internal quotation marks omitted). The duty "does not operate in a vacuum[;]" rather it "focuses on the agreed common purpose and the justified expectations of the parties, both of which are intimately related to the parties' manifestation of their purposes and expectations in the express provisions of the contract." *Or. Univ. Sys. v. Or. Pub. Emp. Union*, 185 Or. App. 506, 515–16, 60 P.3d 567 (2002) (internal quotation marks omitted). Because the duty cannot contradict an express contractual term, it "'may be implied as to a disputed issue *only* if the parties have not agreed to an express term that governs that issue.'" *Arnett v. Bank of Am., N.A.*, 874 F.Supp.2d 1021, 1033 (D. Or. 2012) (quoting *Or. Univ. Sys.*, 185 Or. App. at 511) (emphasis in *Arnett*).

The Court disagrees with Defendant's contention Plaintiff cannot pursue both its breach of contract and breach of the implied covenant of good faith and fair dealing claims as they relate to the Teaming Agreement, Non-Disclosure Agreement, and Terms of Use.[1] The crux of Defendant's argument is that as a matter of Oregon law, both claims cannot be brought in the same action where the same facts are alleged to support each claim. *See* Def. MSJ 25 ("Opal alleges the very same conduct for Sprinklr's alleged direct breach of the contracts as it alleges was 'not within the objectively reasonable expectations of Opal when it entered into the

---

[1] In an email to the Court on July 12, 2021, Plaintiff withdrew its claim for breach of the implied covenant of good faith and fair dealing as it relates to the Integration Agreement, which is governed by New York Law. *See Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002) ("New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.").

contract.'"). But this conclusion is not supported by the case law. Defendant appears to conflate claims arising under the same set of facts with claims where the implied terms for the purposes of breach of the implied covenant of good faith and fair dealing are duplicative of those in the express agreement. Under Oregon law, a plaintiff may succeed on one or both claims premised on the same facts. *Foraker v. USAA Casualty Ins. Co.*, 345 F.Supp.3d 1308, 1310 (D. Or. 2018) (citing cases); *Gunderson LLC v. BCG Properties Group, Inc.*, Case No. 3:19-cv-01569-AC, 2020 WL 1529356, at *10 (D. Or. Mar. 30, 2020) (finding the plaintiff's "claim for breach of the duty of good faith and fair dealing will not fail even if based on the same facts alleged to constitute a breach of the express contract"); *see also Klamath Off-Project Water Users,* 237 Or. App. at 445 ("A party may violate its duty of good faith and fair dealing without also breaching the express provisions of a contract. In addition, a claim for breach of the duty of good faith and fair dealing may be pursued independently of a claim for breach of the express terms of the contract"); *Morrow v. Red Shield Ins. Co.,* 212 Or. App. 653, 662, 159 P.3d 384 (2007) (holding that the insurer was entitled to summary judgment on the plaintiffs' breach of contract claim but allowing a breach of the duty of good faith and fair dealing claim based on the same facts to proceed to trial).

Moreover, Plaintiff's claims are not entirely duplicative. For example, Plaintiff alleges Defendant breached the confidentiality terms of the Teaming Agreement in accessing Plaintiff's confidential information and then developing its own version of Plaintiff's software. Third Am. Compl. ¶¶ 61–68, ECF 212. But if Plaintiff is not successful on this claim, Plaintiff could demonstrate that Defendant breached the implied covenant of good faith and fair dealing in using information exchanged under the Teaming Agreement—under which the parties agreed to jointly promote their services—to "develop and promote a competing product[] and . . . encourag[e]

mutual clients to sever existing business agreements with [Plaintiff]." Third Am. Compl. ¶¶ 69–73. This is not a case where the "implied terms" are necessarily "duplicative of those asserted to be part of the express agreement." *Global Exec. Mgm't Solutions, Inc. v. Int'l Bus. Machines Co.*, 260 F.Supp.3d 1345, 1377 (D. Or. 2017). Under Oregon law, Plaintiff may be able to pursue either or both claims. Accordingly, Defendant's motion for summary judgment on these claims is denied.

> D.    Plaintiff's Claims for Fraud and Tortious Interference

Defendant argues that Plaintiff's claims for fraud and tortious interference are preempted by the OUTSA because they arise out of the same conduct. Def. MSJ 25. The OUTSA supersedes "conflicting tort, restitution, or other law of Oregon providing civil remedies for misappropriation of a trade secret." O.R.S. 646.473(1). "Oregon courts have not interpreted [the] language [of O.R.S. 646.473] or addressed the extent to which the Act preempts civil remedies." *Precision Automation, Inc. v. Tech. Servs., Inc.*, No. 07-CV-707-AS, 2007 WL 4480736, at *2 (D. Or. Dec. 14, 2007) (quoting *Acrymed, Inc. v. Convatec*, 317 F.Supp.2d 1204, 1217 (D. Or. 2004)). Cases from this district and elsewhere, however, have concluded that "the preemptive effect" of the statute extends "to claims that are based on the same operative facts as a claim for trade secret misappropriation under the Act." *Id.*; *see also Select Timber Prod. LLC v. Resch*, No. 3:17-cv-00451-HZ, 2017 WL 3709066, at *4–5 (D. Or. Aug. 27, 2017) (citing cases); *Alternative Legal Sols., Inc. v. Ferman Mgmt. Servs., Corp.*, CV-07-880-ST, 2009 WL 10733692, at *13 (D. Or. May 5, 2009) ("[T]he majority of courts that have considered the issue have concluded that their preemption provisions (identical to O.R.S. 646.473) preempt claims that are based upon the unauthorized use of information, regardless of whether that information meets the statutory definition of a trade secret." (internal quotations and citation omitted)). The

key question underlying this analysis is whether "the essence of the [tort] claim relates primarily to the alleged misappropriation of a trade secret." *Precision Automation*, 2007 WL 4480736, at *2. If so, "the claim is displaced by the preemptive language of the Act." *Id.*

Turning first to Plaintiff's claim for Tortious Interference with Economic Relations, the Court finds that Plaintiff's claim is superseded by the OUTSA. Plaintiff alleges that Defendant interfered with its business relationships "by developing a knockoff version of [Plaintiff's] software and services and promoting that knockoff to Nike and [Plaintiff's] existing clients." Third Am. Compl. ¶ 154. It further alleges that the improper means used by Defendant to interfere with its economic relations include: "making misrepresentations to [Plaintiff], surreptitiously gaining access to [Plaintiff's] software and pricing information, misappropriating [Plaintiff's] trade secrets, and misappropriating [Plaintiff's] confidential information to develop a knockoff product that [Defendant] sold and is attempting to sell to [Plaintiff's] clients and prospective clients." Third Am. Compl. ¶ 155. Thus, the essence of Plaintiff's tortious interference claim relates primarily to the alleged misappropriation of trade secrets and is superseded by the Act. *See Alternative Legal Sols.*, 2009 WL 10733692, at *14–16 (finding tortious interference claims preempted where all of the plaintiff's claims were "premised upon a single series of circumstances and events with its genesis in defendants' unauthorized access to [the plaintiff's] DCMS and its culmination in either the unauthorized access itself or the acquisition or use of information garnered from that unauthorized access to develop, market, and sell a competing system"); *Garfias v. Portland Spray Works, Inc.*, No. 3:20-cv-00873-IM, 2021 WL 27456, at *7 (D. Or. Jan. 3, 2021) (finding tortious interference claims preempted where the allegations of improper means were not supported by any additional facts beyond the alleged misappropriation of trade secret information). *Cf. Precision Automation,* 2007 WL 4480736, at

14 – OPINION & ORDER

*2 (declining to dismiss a claim for tortious interference where the plaintiffs' claim was not dependent on allegations of misappropriated trade secrets). Defendants are therefore granted summary judgment on Plaintiff's claim for Tortious Interference with Economic Relations.

Plaintiff's claim for fraud, however, is not preempted by the Act. Unlike Plaintiff's claim for tortious interference, the allegations at the core of Plaintiff's fraud claim do not depend on Plaintiff's claim for trade secret misappropriation. Rather, the basis of Plaintiff's fraud claim is Defendant's statements during the parties' May 1, 2014 phone call, where Plaintiff alleges that Defendant made false representations to Plaintiff regarding its access to Plaintiff's software, the parties' business relationship, and Defendant's plans to develop its own marketing collaboration product. Third Am. Compl. ¶ 52. Plaintiff alleges that these misrepresentations were made with the intent to "induce [Plaintiff] to continue in a business relationship with [Defendant], to provide [Defendant] with further access to [Plaintiff's] software, and to trick [Plaintiff] into believing that it did not face a competitive threat to its relationship with Nike from [Defendant]." Third Am. Compl. ¶ 55. Plaintiff asserts that it relied on these statements in continuing its relationship with Defendant, delaying the filing of a lawsuit, giving Defendant access to its software to jointly pitch clients, agreeing to integrate with Defendant, and allowing Defendant and others access to its software. Third Am. Compl. ¶ 57. While there is some overlap between the allegations underlying Plaintiff's trade secrets claim and its fraud claim, the core allegations in Plaintiff's fraud claim—most notably, the statements made in the parties' May 1 phone call and Plaintiff's reliance on those statements to continue the parties' business relationship—are not the operative facts underlying its trade secret misappropriation. *See* Third Am. Compl. ¶¶ 131–148 (alleging Defendant misappropriated Plaintiff's trade secrets by improperly accessing

Plaintiff's confidential information). As the essence of Plaintiff's claim for fraud does not relate primarily to the alleged misappropriation, Defendant is denied summary judgment on this claim.

## II.      Plaintiff's Motion for Summary Judgment

Plaintiff moves for summary judgment on several of Defendant's affirmative defenses and its reservation of rights to seek attorney's fees for a bad faith trade secret claim. Plaintiff also asks the Court to grant summary judgment on two issues of fact involving the extent of Nike's development and ownership of Plaintiff's platform. The Court resolved most of Plaintiff's motions at oral argument. All that remains for resolution are Plaintiff's motions as to Defendant's Seventh Affirmative Defense—Jury Trial Waiver—and Fourteenth Affirmative Defense—Unclean Hands.

### A.      Defendant's Seventh Affirmative Defense: Jury Trial Waiver

Plaintiff moves for summary judgement on Defendant's Seventh Affirmative Defense, which alleges that Plaintiff's jury trial demand is foreclosed by the Teaming Agreement. Pl. MSJ 4. Analogizing to Georgia and California case law, Plaintiff argues that this defense "[f]ails as a matter of law because prelitigation jury waivers, like the one in the Teaming Agreement, are unenforceable under Oregon law." *Id.* Defendant responds that Plaintiff's argument is misplaced because Oregon courts have enforced pre-litigation waivers of the right to a jury trial. Def. Resp. Pl. MSJ 1–4, ECF 257.

The Court cannot conclude that the Teaming Agreement's jury trial waiver is unenforceable as a matter of Oregon law. Article I, section 17, of the Oregon Constitution provides "in all civil cases the right of Trial by Jury shall remain inviolate." However, the Oregon Court of Appeals has held that "a party may voluntarily waive the right by agreement." *Hays Group, Inc. v. Biege*, 222 Or. App. 347, 351, 193 P.3d 1028 (2008) (citing *Carrier v.*

Hicks, 316 Or. 341, 352, 851 P.2d 581 (1993)); *see also Barackman v. Anderson*, 338 Or. 365, 371, 109 P.3d 1070 (2005) ("Constitutional rights may be waived, however, and the right to a jury trial is one of those rights that may be waived."); *Kesterson v. Lewis*, 126 Or. App. 329, 334, 868 P.2d 1350 (1994) (finding that "a party can waive the right to a jury trial in ways other than those described in ORCP 51C, even if the case is exclusively at law"). While Plaintiff is correct that most cases involving waiver of this right arise in the context of arbitration agreements, Plaintiff has not identified any reason that the Oregon appellate court's unambiguous statements that this right may be waived would not apply to agreements like the Teaming Agreement involved in this case. Accordingly, the Court denies Plaintiff's Motion for Summary Judgment on Defendant's Seventh Affirmative Defense.

Plaintiff also argues—with little analysis—that the jury trial waiver applies only to claims arising out of the Teaming Agreement and not the claims arising out of the other agreements or the OUTSA. Pl. MSJ 4; Pl. Reply MSJ 3, ECF 280. However, this argument is has not been adequately developed by either party. The Court therefore reserves ruling on the scope of the jury trial waiver.

E.    Defendant's Fourteenth Affirmative Defense: Unclean Hands

Plaintiff moves for summary judgment on Defendant's Fourteenth Affirmative Defense, which alleges that Plaintiff is barred from obtaining equitable relief because of its own bad acts. Pl. MSJ 13.  Plaintiff argues that the Court should dismiss this defense because Defendant does not have any evidence that it "engaged in inequitable conduct that is related to the transaction giving rise to" Plaintiff's declaratory and injunctive claims for relief. *Id.*

"'Unclean hands' is an equitable doctrine under which the court, in order to protect its own integrity, will deny equitable relief to a party in a transaction if that party, relative to the

same transaction, is 'guilty of improper conduct no matter how improper the [other party's] behavior may have been.'" *Welsh v. Case*, 180 Or. App. 370, 385, 43 P.3d 445 (2002) (quoting *Merimac Co. v. Portland Timber*, 259 Or. 573, 580, 488 P.2d 465 (1971)). For the doctrine of 'unclean hands' to bar an equitable claim, "the misconduct must be serious enough to justify a court's denying relief on an otherwise valid claim. Even equity does not require saintliness." *North Pac. Lumber Co. v. Oliver*, 286 Or. 639, 651, 596 P.2d 931 (1979). Such conduct includes "crimes, fraud, disloyalty to an employer, and bad faith." *Welsh*, 180 Or. App. at 385 (citing *North Pac. Lumber*, 286 Or. at 651). In addition, "the misconduct must bear a certain kind of relationship to the subject matter of the suit before a court will consider it." *North Pac. Lumber*, 286 Or. at 651.

The Court declines to resolve this issue now. While the Court recognizes that Plaintiff has identified a significant lack of evidentiary support for Defendant's affirmative defense, reaching the merits of this equitable defense at summary judgment is premature. Defendant's unclean hands defense is only relevant if Plaintiff prevails on the merits of its claim, and the evidence in this case is not yet fully developed. *See Waymo LLC v. Uber Techs., Inc.*, No. C 17-00930 WHA, 2017 WL 6887040, at *3 (N.D. Cal. Nov. 14, 2017) ("Since this *equitable* defense will have meaning only if Waymo ultimately prevails on the merits, there is no need to reach it now. Indeed, it would be premature to decide the issue at this stage, since litigation remains ongoing and further evidence of Waymo's misconduct may yet come to light."). Because this is an issue for the Court, the Court can rule on the merits of the defense after trial is complete. Accordingly, the Court denies Plaintiff's motion for summary judgment on Defendant's Fourteenth Affirmative Defense.

///

**CONCLUSION**

The Court DENIES Plaintiff's Motion for Summary Judgment [221] and GRANTS in part and DENIES in part Defendant's Motion for Summary Judgment [225]. Defendant's motion is granted as to Plaintiff's claim for Tortious Interference with an Economic Relationship and otherwise denied. Plaintiff's Thirteenth Claim for Relief is dismissed.

IT IS SO ORDERED.


DATED: ___August 19, 2021_____.




_____
MARCO A. HERNÁNDEZ
United States District Judge